**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RICHARD ROSADO,**

                              **Plaintiff,**

        **vs.**                                          **9:13-CV-359**
                                                          **(TJM/TWD)**


**DR. TERRI MAXYMILLIAN,  Sex Offender**
**Treatment Program Director,  JEFF NOWICKI,**
**Sex Offender Treatment Program Administrator,**
**PETER RUSSELL, Acting Executive Director**
**of CNYPC, f/k/a Maureen Bosco, and**
**ANN SULLIVAN, Commissioner of the**
**Office of Mental Health,**

                              **Defendants.**
_____

**CHARLES W. GERENA, and RICHARD PELLEGRINO**

                              **Plaintiffs,**

        **vs.**                                          **9:15-CV-489**
                                                          **(TJM/TWD)**


**ANNE MARIE T. SULLIVAN, Commissioner, New**
**York State Office of Mental Health, TERRI**
**MAXYMILLIAN, Director for the New York State OMH,**
**Treatment Services at CNY PC, JEFF NOWICKI,**
**Chief of Treatment Services for the**
**New York State OMH, SOTP at CNY PC, and**
**DEBORAH J. MCCULLOCH,**

                              **Defendants.**
_____

**JOSEPH GALLAGHER, LARRY SCHRAENKLER, JOHN**
**PEANA, and ARTHUR KOHLER,**

**Plaintiffs,**

**vs.**                                                            **9:15-CV-1327**
                                                                   **(TJM/TWD)**

**ANNE MARIE T. SULLIVAN, Commissioner, New
York State Office of Mental Health, CHRISTOPHER
KUNKLE, Director of the Bureau of Institutional
Sex Offender Treatment for the New York State
Department of Mental Health, MAUREEN A. BOSCO,
former Executive Director of OMH's CNYPC-SOTP
Facility, PETER RUSSELL, former Executive Director
of OMH's CNYPC-SOTP Facility, TERRI MAXYMILLIAN,
former Director of the Sex Offender Treatment Program
at OMH's CYNPC-SOTP Facility, TIMOTHY LAMITIE,
Former Executive Director of OMH's CNYPC-SOTP
Facility, sued in his individual capacity, SHANNON
FORSHEE, Director of the Sex Offender Treatment
Program at CNYPC-SOTP Facility, JEFF NOWICKI,
Chief of Mental Health Treatment Services for the
CNYPC-SOTP Facility, DEBORAH J. MCCULLOCH,
Executive Director of Central New York Psychiatric
Center, sued in her official capacity, and REBECCA
DAVIS, Religious Liaison, CYNPC,**

**Defendants.**
_____

**Thomas J. McAvoy,
Sr. U.S. District Judge**

**DECISION & ORDER**

        These three cases, filed by patients committed to the Sex Offender Treatment

Program at the Central New York Psychiatric Center in Marcy, New York, allege that the

conditions of such confinement violate residents' constitutional rights.  The Plaintiffs

seek declaratory and injunctive relief.  After discovery, the Defendants in each of the

cases have filed motions for summary judgment.  Since Plaintiffs' claims allege

2

constitutional violations based on the same policies at the same institution, the Court will address those motions in a single memorandum.

I.      BACKGROUND

The Plaintiffs in these cases have all been committed to the Sex Offender Treatment Program ("SOTP") at the Central New York Psychiatric Center ("CNYPC") in Marcy, New York (collectively, the "CNYPC-SOTP").  Their commitment to this facility is a result of Article 10 of the New York State Mental Hygiene Law, NY CLS Men Hyg § 10.01 et seq.  That statute provides in relevant part that the legislature has concluded that some sex offenders have "mental abnormalities that predispose them to engage in repeated sex offenses."  NY CLS Men Hyg § 10.01(b).  Such persons, the statute provides, "may require long-term specialized treatment modalities to address their risk to reoffend" while in prison, "and should continue to receive treatment when that incarceration comes to an end."  Id.  For "extreme cases, confinement of the most dangerous offenders will need to be extended by civil process in order to provide them such treatment and to protect the public from recidivistic conduct."  Id.  New York law sets up procedures for civil commitment, review of commitments, and release of offenders who no longer require civil commitment.  See NY CLS Men Hyg §§ 10.01-10.17.

These cases do not challenge the constitutionality of the civil commitment program, but instead challenge the conditions of that confinement.  The Plaintiffs allege that the Defendants, who direct, design, and operate the Sex Offender Treatment Program, have violated their constitutional rights by their policies regarding access to media, vocational training, access to the courts, visitation, and transport to court

3

hearings and medical appointments.  They seek injunctive relief to protect against this allegedly unconstitutional policies.

### i.    The Treatment Program

Defendants describe CNYPC-SOTP as "a secure treatment facility where residents receive treatment to address their risk to sexually reoffend."  Defendants' Statement of Material Facts in 13cv359 ("359 Defendants' Statement"), dkt. # 136-28, at ¶ 5.[1]  Staff at the facility includes psychiatrists, psychologists, social workers, nurses, rehabilitation staff, and treatment aides.  Id. at ¶ 6.  Residents live in two separate buildings at the facility, "Building 39" and "Building 41."  Id. at ¶ 7.  Defendants claim that they have "developed a comprehensive program to treat recidivistic sex offenders committed to custody."  Id. at ¶ 8.  Plaintiffs do not deny that a program exists, but they dispute whether the program works as intended.  Plaintiffs' response to 359 Defendants' Statement ("359 Plaintiffs' Response"), dkt. # 160, at ¶ 8.  Plaintiffs likewise dispute Defendants' claim that the treatment program in place "is the product of the professional judgment of the clinical staff" in the New York Office of Mental Health ("OMH") and that the program "reflects the best practices in the field of sex offender management."  359 Defendants' Statement at ¶ 9; 359 Plaintiffs' Response at ¶ 9.

---

[1]Defendants in each of these cases filed statements of material fact about which they allege there is no dispute, with citations to the record as required by Local Rule 7.1(a)(3).  Plaintiffs responded, either agreeing that no dispute existed or by pointing to parts of the records which established that the fact alleged was in dispute.  Because case number 13cv359 was the first-filed case, the Court will use the documents in that case to lay out the facts.  The Court will cite to the Defendants' statement in that case for facts which are not disputed and note where the Plaintiffs have a dispute.  The Court has examined the statements filed in the other cases and will cite to those statements throughout this decision and order when appropriate.

Plaintiffs also deny Defendants' claim that the facility's programs get "continually updated in response to new evidence and evolving best practices in the field of sex offender management." 359 Defendants' Statement at ¶ 10; 359 Plaintiffs' Response at ¶ 10.

SOTP operates using a framework based on "Risk, Need and Responsivity ("RSN"). 359 Defendants' Statement at ¶ 11. Defendants claim the purpose of that program is "to align each resident's risks with the services provided to maximize the effectiveness of treatment." Id. Residents have an assigned "Treatment Team" with which they meet. Id. at ¶ 12. According to Defendants, the meetings "develop an Individual Service Plan ("ISP") to define needs, treatment goals, and the methods that will be employed to reach those goals." Id. According to the Defendants, the ISP gets reviewed at minimum every 180 days. Id. at ¶ 13. The reviews assess "the resident's progress towards the Treatment Targets identified in the ISP" and tracks progress through "Stages of Change." Id. at ¶¶ 14-15. Defendants claim that the Stages of Change help identify where a resident makes progress and where changes need to occur. Id. at ¶ 16. Plaintiffs, citing their experience, dispute that the program actually operates this way. Id. 359 Plaintiffs' Response at ¶ 16.

Policy directs that SOTP residents receive a minimum of ten hours of weekly group therapy, individual therapy, education, vocational training, and/or health related programming. 359 Defendants' Statement at ¶ 17. Defendants claim the exact program depends on residents' needs. Id. Residents can decline to participate in treatment however, and are not forced to engage. Id. at ¶ 18. Defendants claim that a resident who does not "fully engage in treatment" is not progressing through the Stages

of Change and may be reenrolled in the same program or a similar program until they make progress enough to advance to the next stage.  Id. at ¶ 19.  Plaintiffs deny this claim, pointing to their own experience of limited programming.  359 Plaintiffs' Response at ¶ 19.

### ii.    Legal Rights and Representation of Residents

Every resident in the SOTP program has a right to an annual review under Section 10.09 of the New York Mental Hygiene Law.  359 Defendants' Statement at ¶ 20.  During such a review, the resident is evaluated by an OMH pyschiatric examiner to determine whether the resident could be safely returned to the community with "strict and intensive supervision and treatment ("SIST").  Id. at ¶ 21.  A resident can "obtain an evaluation by an independent psychiatric examiner."  Id.  The OMH drafts conditions of supervision when a judge issues a SIST order.  Id. at ¶ 22.  A sex offender with a SIST order who proves dangerous and in need of continued confinement can be returned to CNYPC-SOTP custody.  Id. at ¶ 23.

The Mental Hygiene Law entitles CNYPC-SOTP residents to "legal services related to admission, retention and care and treatment through Mental Hygiene Legal Services ("MHLS")."  Id. at ¶ 24.  T statute mandates that MHLS "'inform patients . . . of the availability of other legal resources which may be of assistance in matters not directly related to admission, retention, and care and treatment of patients and residents.'"  Id. at ¶ 25 (quoting Mental Hygiene Law § 47.03).  That law also provides MHLS the power "'to initiate and take any legal action deemed necessary to safeguard the right of any patient to protection from abuse or mistreatment.'"  Id.  at § 26 (quoting Mental Hygiene Law § 47.03).

6

### iii.   Access to the Lawyers and Legal Materials

Defendants claim that CNYP-SOTP residents have access to LexisNexis computer-based legal research materials.  Id. at ¶ 27.  Plaintiffs dispute the adequacy of these materials, the training provided to use them, and the amount of access that the facility provides for performing legal research.  359 Plaintiffs' Response at ¶ 27.  The LexisNexis terminals are in the library in each building, and Defendants claim that they are available to residents for six hours each weekday and four hours on weekends. 359 Plaintiffs' Statement at ¶¶ 28-29.[2]  Defendants also contend that the residents "have access to printing services for their research."  Id. at ¶ 28.  Plaintiffs dispute the adequacy of this access, pointing out that the space in the library for computer use is often occupied, that staff members charged with providing access have failed to do so for periods of time, that training on how to use a computer-based research system is inadequate and staff members who have been trained in such research have not been helpful, and that the cost of making copies is too expensive at $.25 per copy.[3]  359

_____

[2]Defendants describe the availability of the terminals as follows:

30.  The LexisNexis terminals are available daily (including weekends) from 9:30 to 11:30 a.m. and from 12:45 to 2:45 p.m. as well as weekdays in Building 39 from 5:45 p.m. to 7:45 p.m. and in Building 41 from 6:00 p.m. to 8:00 pm. Additionally, printing for LexisNexis is scheduled weekdays from 8:30 a.m. to 9:30 a.m.

359 Defendants' Statement at ¶ 30.

[3]Richard Rosado, one of the original Plaintiffs in this action and a resident, relates that:

40.      . . . physical access to the computer database continues to be a problem. In my building, the library is the only common area for residents to gather besides they gym during the day when the classrooms are in use.  The gym is

not conducive to conversations, so as many as fifteen residents or more often congregate in the library during the day.  There are only eight chairs in the library, four of which are supposed to be reserved for the LexisNexis terminals, preventing others from accessing LexisNexis.  There is not enough space in the library for both LexisNexis research and to serve as a common space for residents.  Although the library is open throughout the day, residents use the law library as a common space during the morning and afternoon.  The only time when the library is regularly accessible for legal research (assuming the LexisNexis terminals are working), is during the evening hours when residents can use the classrooms and other places as common space.

41.     . . . the library computer terminals cannot be turned on without a key, and only one staff member has the key.  This has led to extended periods of time where I have not been able to conduct legal research due to the unavailability of the LexisNexis terminals.
. . .

43.     Though LexisNexis may be a powerful legal research tool for computer-savvy lawyers, navigating it is not easy or intuitive for most people I know.  Many residents have been confined at CNYPC-SOTP and in DOCCS before that without regular access or exposure to computers for years.  Many of us have never been trained in use of computers, while others have outdated training that predates the modern applications of today's computer-based world.  As a sophisticated legal research platform, LexisNexis requires specialized training. Without even basic training, residents do not have meaningful access to the courts.

44.     No hands on LexisNexis training for residents has been provided. Residents have access to a LexisNexis Quick Research Guide.  This Reference Guide . . . is wholly insufficient from a training standpoint.

45.     Certain CNYPC-SOTP staff members have allegedly received some LexisNexis training, but no training . . . was provided for the residents who will actually be using LexisNexis.  These staff members are not immersed in LexisNexis, nor do they use it on [a] regular basis.

52.     Beyond the difficulties in using and accessing materials on LexisNexis, there have been difficulties in printer access.  Printer access was not established until the Fall of 2018, more than a year after LexisNexis was installed.  Though it is CNYPC-SOTP policy to allow residents to submit printing requests and obtain hardcopies of their research, at 25 cents per copy, the cost to make copies is also very high[.]

Plaintiffs' Response at ¶ 28.  A staff member trained in how to use the database, Defendants claim, "is available" in the buildings where SOTP residents are housed to assist them in using the system.  Id. at ¶ 31.  Plaintiffs dispute this claim for the reasons described above.  359 Plaintiffs' Response at ¶ 31.  The parties disagree about whether Defendants have promptly addressed disruptions to the service.  359 Defendants' Statement at ¶ 32; 359 Plaintiffs' Response at ¶ 32.  CNYPC-SOTP provides an attorney telephone number that attorneys can use to contact a resident.  359 Defendants' Statement at ¶ 33.

### iv.   Restraints

Defendants allege that residents of the facility participating in the SOTP program "are safety and flight risks who have been determined by court order to be dangerous with a propensity for committing sexual crimes."  Id. at ¶ 34.  Plaintiffs deny this claim. 359 Plaintiffs' Response at ¶ 34.  Defendants secure residents with safety and security devices when they transport the residents off facility grounds.  359 Defendants' Statement at ¶ 35.  Such devices include handcuffs, transport belts, leg irons, wrist-to-belt devices, and a system called the "black box."  Id. at ¶ 36.  This "black box" works as "a device which covers the locking mechanism of the handcuffs to prevent picking or tampering with the locking mechanism."  Id. at ¶ 37.  Plaintiffs contend that the Defendants use the device "to inflict pain."  359 Plaintiffs' Response at ¶ 37. Defendants contend that they use such security measures on residents when they are outside the facility "in order to protect the safety of the residents, transport staff, and the

---

Richard Rosado Declaration ("Rosado Dec."), dkt. # 160-1 in case no. 13cv359, at ¶¶ 40-41, 43-45, 52.

public." 359 Defendants' Statement at ¶ 38.  Plaintiffs deny this statement, pointing to the portion of one of their declarations that declares that there have been no reports of escapes or attempted escapes by residents in the nearly twelve years he has resided at the facility.  Id. at ¶ 39; 359 Defendants' Response at ¶ 39 (citing Rosado Dec. at ¶ 60).

Residents who leave the facility in this fashion are also required to wear khaki pants and red shirts.  Defendants' Statement of Material Facts in 15cv489 ("489 Defendants' Statement") at ¶ 43.  Defendants' claim that the purpose of such clothing is to "[insure] that security staff and medical professionals can readily identify CNYPC-SOTP patients in buildings and areas that are unfamiliar to security staff.  Id. at ¶ 44.  Plaintiff Richard Pellegrino disputes this claim.  See Affidavit of Richard Pellegrino, dkt. # 127-4 in case no. 15cv489 ("Pellegrino Affidavit").[4]  He points out that when he makes a trip to the prison medical facility wearing the khakis and red shirt, "everyone knows you are a sex offender."  Id. at ¶ 105.  He contends that "other prisoners and health care work[ers] are not fond of sex offenders."  Id. at ¶ 106.  He suffers abuse "every time I go out of the facility and the uniform they make me wear flags me for that abuse." Id. at ¶ 107.

Defendants allege that Safety and Security Officers ("SSOs") who accompany residents outside the facility "wear uniforms that identify them as security staff within the

_____

[4]Plaintiffs in the 489 case have filed a response to Defendants' statement of material facts in that case.  See Plaintiffs' Response to Defendants' Statement of Material Facts in case 15cv489 ("489 Plaintiffs' Response").  With regard to this issue, the statement points generally to the Pellegrino's 10-page affidavit without citing to any particular paragraph numbers.  Plaintiffs' response would be more useful to the Court if Plaintiffs would point to specific paragraphs in the affidavit that support their position on a particular factual question.

employ of OMH."  489 Defendants' Statement at ¶ 45.  "These uniforms," Defendants

insist, "identify security staff to the public and maintain a professional appearance."  Id.

at ¶ 46.  Plaintiffs admit that officers wear such uniforms and agree to the purpose

stated by Defendants.  489 Plaintiffs' Response at ¶¶ 45-46.  Pellegrino relates that

guards at one point wore "black jackets that say SOTP on [the] back," but that he has

"not seen them wear those jackets in a while."  Pellegrino Affidavit at ¶ 108.

                    v.    **Access to Media**

        The facility regulates access to books, newspapers, magazines, movies,

television, music, and other media for residents.  359 Defendants' Statement at ¶ 39.

The aim of such restrictions is "to ensure such media is in line with the treatment needs

of the residents."  Id.  The program "generally prohibit[s]" media that includes

"excessive violence, vulgar language, antisocial values, material demeaning toward

women, sexual content, civil disobedience, weapons, drug use, material related to

children, and local media" because such material undermines "treatment needs."  Id.  at

¶ 40.  The facility also seeks "to encourage pro-social behavior" and "protect the privacy

and safety of staff."  Id.  Residents may request access to "certain media."  Id. at ¶ 41.

Staff reviews such requests and "either approve or deny" them "with an explanation."

Id.  Residents may not have newspapers or periodicals from organizations located

within 65 miles from CNYPC-SOTP.  1327 Defendants' Statement at ¶ 52.  Defendants

assert that this prohibition serves to permit residents to obtain "outside news and

information" while "minimiz[ing] access to personal information about staff members

and their families who generally live within" that distance of the facility.  Id.  Plaintiffs

dispute the reasoning for this rule, since residents can watch television news from

                                    11

stations within 65 miles of the facility.  See Affidavit of Arthur Kohler, dkt. # 156-1, in
15cv1327, at ¶ 11; Schraenkler Affidavit at ¶ 12.

CNYPC-SOTP prohibits "devices with internet capability, including cellphones
and computers."  Id. at ¶ 42.  Defendants contend that permitting internet access would
allow residents to get "access to pornography, including child pornography, violent
content, or other content that could pose a safety risk to the facility."  Id. at ¶ 43.
Defendants also assert that residents could "disseminate such content" to others in the
facility without SOTP knowledge.  Id.  Plaintiffs deny this statement, pointing to the
declaration of Richard Pulver, who has worked in information technology for nearly
twenty-five years.  Declaration of Richard Pulver, dkt. #160-13 in case no. 13cv359, at ¶
1.  He disputes that allowing residents access to the internet would permit them
"unfettered access to anything and everything on the Internet."  Id. at ¶ 3.  Instead,
Pulver claims, the facility could introduce "controlled and highly monitored" Internet
access for residents.  Id. at ¶ 4.  With such measures, Pulver claims, residents could
access the internet in a way that would prevent them from visiting the sort of sites about
which Defendants express concern.  Id. at ¶¶ 4-5.  The facility does permit Defendants
to purchase MP3 players from an approved vendor.  359 Defendants' Statement at ¶
44.  Residents can "have approved music files loaded onto the device by the vendor."
Id.   In addition to these MP3 players, the facility also permits residents to have
televisions in their personal living areas.  1327 Defendants' Statement at ¶ 57.

vi.    Visitors

Residents of the facility can have personal visitors on weekends and holidays.
Id. at ¶ 45.  The facility permits legal visits during the week, as well as on weekends and

holidays.  Id. at ¶ 46.  The facility must preapprove all visits.  Id. at ¶ 47.  Both Building

39 and Building 41 permit visitors every Saturday and every major holiday from 9:45

a.m. to 2:45 p.m.  Id. at ¶ 48.  Building 41 permits visitors every Sunday; Building 39

permits visitors the first and third Sunday of every month.  Id. at ¶¶ 49-50. The Building

39 visiting room can accommodate 40 visitors at once, while the Building 41 room

permits thirty individuals at one time.  Id. at ¶¶ 51-52.  Both rooms contain tables,

chairs, and vending machines.  Id. at ¶ 53.  Residents and visitors may "have limited

physical contact."  Id.  The facility prohibits "outside food" during visits.  Id. at ¶ 54.

Defendants claim this prohibition exists "to ensure the health of the residents and

prevent contraband from entering" CNYPC.  Id.

      **vii.   Telephones**

      The CNYCP-SOTP has a policy concerned with approved telephone numbers for

residents.  489 Defendants' Statement at ¶ 71.  Defendants assert that the purpose of

such restrictions is "to ensure that telephone contacts will not interfere with a resident's

treatment[.]"  Id.  The Plaintiffs deny this claim, but do not point to any evidence of

record to support their denial.  489 Plaintiffs' Response at ¶ 71.  The facility has a

"Global Telephone List of public numbers."  489 Defendants' Statement at ¶ 72.  These

are public numbers that all residents may call.  Id.  The Defendants claim that residents

may request to add numbers to their individual approved lists.  Id. at ¶ 73.  The

resident's Treatment Team reviews such requests, and approves them "unless the

individual or entity is deemed counter-therapeutic, or otherwise poses a risk of safety

and security."  Id. at ¶ 74. Treatment Teams deny a request if the contact requested "is

a victim, other resident, family member of another resident, an individual or entity who

13

has requested not to be contacted, a current or former CNYPC-SOTP staff member, a contact already approved on another resident's contact list, or if the request is for a conference call." Id. at ¶ 75.  A vendor who has won a contract through New York State procurement procedures sets the price for phone calls.  Id. at ¶ 76.  Residents can, however, request to make free calls by using "phone slips."  Id. at ¶ 77.  The Treatment Team reviews such requests and generally approves them within twenty-four hours, unless the Team has a concern similar to those discussed above.  Id.

### ix.    Employment and Vocational Training

The SOTP provides residents with an opportunity to work and earn minimum wage in a Vocational Rehabilitation Program.  Id. at ¶ 55.  A resident's primary therapist refers the resident to the work program.  Id. at ¶ 56.  That person's Treatment Team approves their participation.  Id.  A resident must be assessed for the appropriateness of the work and the job placement and must be medically cleared before participating in the work program.  Id. at ¶ 57.  Among the positions available to residents are different janitorial positions in various parts of the SOTP facility, kitchen work, food preparation, food service, dishwashing, in the Copy Center and Stationary Store, sewing, vehicle detailing, lawn and ground maintenance, snow removal, laundry work, and jobs in the library.  Id. at ¶ 58.

The parties agree that the program provides benefits, including "learning how to keep a work schedule, learning job skills, and working with others in a pro-social manner."  Id. at ¶ 59.  Still, if the work proves to be "counter-therapeutic," the program may remove a resident.  Id. at ¶ 60.  Likewise, a work program participant who engages in "unsafe behavior" or who "disengage[s] from recommended treatment programs" can

14

be removed from their work assignment.  Id. at ¶ 61.  CNYCP-SOTP professionals,

including Salvatore Licari, who directs the Mental Health Rehabilitation Program,

believe that the work program helps residents get ready to renter society.  1357

Defendants' Statement at ¶ 45.  Defendants also claim that the work program

"reinforces treatment goals, and the scope and availability" of work and "vocational

opportunities . . . reflect the judgment of professionals at CNYCP."  Id. at ¶ 49.

Plaintiffs contend that "work hours and opportunities are extremely limited and not

designed to provide vocational training to residents[.]."  Affidavit of Larry Schraenkler

("Schraenkler Affidavit") dkt. # 156-3 in 15cv1327, at ¶ 16.  Work opportunities are

limited and serve only to "[perform] the tasks necessary to run the facility and . . .

provide a lower cost labor force to the state."  Id.  Jobs are not challenging and do little

to aid residents, Plaintiffs claim; as one relates: "[t]he idleness and monotony of having

little to fill my days leads to feelings of depression and hopelessness.  Although we are

supposed to be here for treatment and care, I have experienced psychological

deterioration as a result of these conditions of confinement."[5]  Id. at ¶ 22.

### x.     Education

The SOTP program offers educational services to residents who have not

obtained a high school diploma.  Id. at ¶ 62.  The program prepares residents to take

the New York exam for a high school equivalency diploma.  Id. at ¶ 62.  Residents who

---

[5]The two other declarations submitted by the individual Plaintiffs in the 1327 case
contain identical statements about the mental-health effects of the lack of a more
comprehensive work program.  See Affidavit of John Peana, dkt. # 156-2 in 1327 case,
at ¶ 15; Affidavit of Arthur Kohler, dkt. # 156-1 in 1327 case, at ¶ 21.

are ready to take the exam do so at the facility.  Id.  Residents can also seek

permission from their Treatment Team to take correspondence courses.  Id. at ¶ 63.

### xi.  Exercise and Physical Activity

Both buildings at the facility have an outdoor yard which residents can access for

at least seven hours each day on weekdays.  489 Defendants' Statement at ¶ 79.  They

can use the areas for five hours each day on the weekend.  Id.  Plaintiffs deny these

claims, but they point to no record evidence in this denial.  489 Plaintiffs' Response at ¶

79.  Each of the yards has walking paths, basketball courts, and a covered pavilion with

picnic tables.  Id. at 80.  Per policy, the facility closes the yards only for inclement

weather or security reasons.  Id. at ¶ 81.  "Security reasons" can include repairing

fencing or "other installations on the grounds."  Id.  Each of the two buildings also has

an indoor gym, weight room, and cardio room.  Id. at ¶ 82.

### xii.  Exercise of Religious Freedom

Defendants allege that the facility assists residents to "have opportunities to

practice their chosen faith consistent with the safe and secure operation of the facility.

1327 Defendants' Statement, dkt. # 137-32, at ¶ 18.  Defendants contend that residents

may "practice their religions, observe religious holy days, and maintain religious texts of

their faith.  Id. at ¶ 19.  Residents who have no religious faith can abstain from religious

practices.  Id.  Both of the buildings used by the SOTP program "has an area on the

treatment mall" to accommodate religious services.  Id. at ¶ 20.  To accommodate a

variety of faiths and meet the facility's administrative needs, the SOTP sets up a

schedule to permit "congregate worship for each faith."  Id. at ¶ 21.  When a "particular

16

faith has a spiritual adviser to lead congregate worship," the facility allegedly permits residents to attend a weekly hour-long service.  Id. at ¶ 22.  Defendants also contend that the facility permits residents another hour per week for other religious instruction, like "bible study, devotions, and faith discussions."  Id.  The facility also has a Chaplain. Id. at ¶ 23.  That Chaplain "has taken on the administrative role of the religious liaison." Id.  Defendants also claim that they make "a second hour of worship to the Neopagan/Druid/Asatru group."  Id. at ¶ 24.

The facility also purports to make food available for religious rituals.  Id. at ¶ 25. Residents may order pork products through the facility's commissary and thus "have access to pork in CNYPC-SOTP."  Id.  Residents can request that food items be added in the commissary.  Id. at ¶ 26.  Religious groups may have special meals twice per year as part of their celebrations.  Id. at ¶ 27.  A religious group may submit a menu to CNYPC-SOTP 45 days before the celebration to permit the ordering and preparation of the food.  Id. at ¶ 28.

Residents may possess religious items, including chains and pendants, with limitations.  Id. at ¶ 29.  Defendants claim that they put limits on which items residents can possess and the "size and value" of such items "to maintain a safe and secure environment."  Id. at ¶ 30.  Plaintiff John Peana sought to possess a cross and chain but was denied permission by the facility.  Id. at ¶ 31.  The cross and chain "greatly exceeded the allowable size for pendants."  Id.  The program told Peana that "he was 'welcome to possess a cross or other pendant that more closely meets the property specifications."  Id. at ¶ 32.

Plaintiffs offer the affidavit of Plaintiff Larry Schraenkler to dispute the claims the Defendants in this matter make about religious practices in the SOTP.  See Schraenkler Affidavit.  At the time he executed the affidavit, Schraenkler had been a resident at CNYPC-SOTP since 2011.  Id. at ¶ 2.  Schraenkler relates that he practices the Asatru faith.  Id. at ¶ 46.  Until the Fall of 2019, he and his fellow Asatru residents were permitted only one hour a week "to worship, study, and participate in other religious activities."  Id. at ¶ 47.  Muslim and Christian residents, he relates, had two hours per week for such activity.  Id.  Beginning in the Fall of 2019, however, Asatru residents heard from facility administrators that they would also have two hours for religious programming.  Id.  As of August, 2020, however, Asatru practitioners had not received the promised two hours; Christians and Muslims had two hours.  Id. at ¶¶ 48-49.

Asatru residents, like other religious groups in the facility, are permitted to celebrate two "feasts, festivals, or holidays–including with holy food–" twice per year. Id. at ¶ 51.  Asatru has "eight (8) high holy days, including Yule and Waluburg's Night." Id. at ¶ 50.  Asatru adherents celebrate Yule and Waluburg's Night at the facility.  Id. at ¶ 52.  In Asatru, these festivals and holidays require that practitioners consume pork as "holy food."  Id. at ¶ 53.  CNYPC-SOTP prohibits the preparation or cooking of pork on the premises due to the beliefs of residents who follow Islam.  Id. at ¶ 54.  Schraenkler relates that, unlike Christian and Muslim residents, he cannot get the food he needs for his religious festivals.  Id. at ¶ 55.  He has "not been able to consume pork for almost five (5) years during at least **nine** Asatru feasts."  Id. (emphasis in original).  While residents may purchase pork in the commissary, their religious feasts take place on the

18

treatment mall, where they cannot bring items purchased in the commissary.  Id. at ¶¶ 56-57.  Asatru residents, therefore, are unable to consume pork during religious feasts, which serves to "substantially diminish" practitioners' "spiritual experience" and put substantial "burdens" on their religious activity.  Id. at ¶¶ 58-59.

### xiv.   "Privileging" Program

The SOTP grants or withholds certain privileges to residents as part of treatment. 1327 Defendants' Statement at ¶ 68.  Defendants claim that residents can earn privileges like additional leisure time, recreational opportunities, and vocational opportunities.  Id. at ¶ 69.  Defendants define such privileges as "earned symbols of treatment progress, community status, and personal autonomy."  Id. at ¶ 70.  Such privileges also, they claim, "encourage residents to develop pro-social behaviors that will allow them to live safely in the community."  Id.  By contrast, behavior that interferes with treatment can cause residents to lose privileges.  Id. at ¶ 71.  Defendants insist that the loss of privileges does not serve as punishment, but that program is instead "one component of the clinical treatment that focuses on stabilizing purposeful dangerous behaviors and/or severe treatment interfering behaviors while offering the opportunity for the resident to develop increased self-management skills."  Id. at ¶ 72. A treatment team makes decisions about a resident's privileges based on factors like "the resident's living unit, the resident's level of participation and effort in treatment, and the resident's demonstrated ability to enjoy the privileges appropriately and without misuse or abuse."  Id. at ¶ 73.

Defendants further contend that residents meet "regularly" with their treatment teams, and that the team makes clear "the targeted behavior(s) the resident needs to

address." Id. at ¶ 74.  Dr. Danielle Dill, who is the Deputy Director of the CNYCP-

SOTP, concludes that "privileging is an effective means by which to promote the

attitude and behavior changes a resident must make to succeed in the SOTP and

ultimately in the community."  Id. at ¶ 75.

Plaintiffs deny that the privileging system works as Defendants describe it does.

See, e.g., Schraenkler Affidavit at ¶¶ 43-45.  Plaintiff Larry Schraenkler contends that

the SOTP has revoked his privileges "for unexplained reasons[.]" Id. at ¶ 44.

Schraenkler has lost his "work, phone, media, exercise, yard, paper, and outside

purchasing privileges."  Id.  Arthur Kohler alleges the same arbitrary loss of privileges.

Affidavit of Arthur Kohler ("Kohler Affidavit"), dkt. # 156-1 in case no. 15cv1327, at ¶ 44.

John Peana alleges that he has lost his privileges for inexplicable reasons on "hundreds

of occasions" since 2008.  Affidavit of John Peana ("Peana Affidavit"), dkt. # 156-2 in

case no. 15cv1327, at ¶ 37.  Peana describes several instances where he faced loss of

privileges and alleges that "in most instances the actions are not taken as part of my

treatment, as the punishment is not even discussed in a treatment context or as a

strategy for" Peana "to eventually progress in treatment and be able to join the

community." Id. at ¶ 42.

The parties have engaged in extensive discovery in this matter in the years since

Plaintiffs filed their first case.  During that period, some Plaintiffs have been released

from NYCPC-SOTP.  As Plaintiffs seek injunctive relief, those Plaintiffs' claims became

moot and those Plaintiffs dropped them and left the litigation.  Defendants have also

changed policies since Plaintiffs filed their claims.  Still, numerous Plaintiffs,

Defendants, and relevant parties have sat for depositions, and paper discovery has

been exchanged.  Defendants have now filed motions for summary judgment in each

case.  The parties have briefed the issues.  The Court will address the Plaintiffs' claims

serially.  The Court notes that the issues here are largely about the policies in place at

the facility and concludes that a single opinion can address the claims of each of the

parties to the action.

## II.    LEGAL STANDARD

Defendants seek summary judgment.  It is well settled that on a motion for

summary judgment, the Court must construe the evidence in the light most favorable to

the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999),

and may grant summary judgment only where "there is no genuine issue as to any

material fact and ... the moving party is entitled to a judgment as a matter of law." FED.

R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable

jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477

U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of

the basis for the motion and of identifying those portions of the record that the moving

party believes demonstrate the absence of a genuine issue of material fact as to a

dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is

able to establish a *prima facie* basis for summary judgment, the burden of production

shifts to the party opposing summary judgment who must produce evidence

establishing the existence of a factual dispute that a reasonable jury could resolve in his

favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A

party opposing a properly supported motion for summary judgment may not rest upon

"mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v.

Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or

unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III.    ANALYSIS

The Court will address each of the constitutional claims raised by the Plaintiffs in

these cases.  Some of the suits did not bring each of the claims here addressed.  The

Court will note that situation where appropriate.

### A.    Religious Freedom

The Plaintiffs in cases No. 15cv1327 and 15cv489 allege that the Defendants'

policies violate their right to free exercise of religion.  See Amended Complaint, dkt. #

73 in 15cv1387, Count One, and Amended Complaint, dkt. # 58 in 15v489, Count

Three.  Count Seven in the 1327 case raises a claim under the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.  Plaintiffs seek a

declaratory judgment on this issue from the Court, and an injunction that prohibits

Defendants from enforcing these policies.[6]

---

[6]Defendants in case no. 15cv489 did not offer any argument about why Plaintiffs'
free exercise claims should be dismissed.  Having examined the depositions and
affidavits of the two remaining Plaintiffs, the Court finds that Richard Pelligrino has no
religious freedom claim.  See Deposition of Richard Pelligrino, dkt. # 106 in case no.
15cv489, at 16 (Q: Are you alleging any violation of your religious rights in this action?
A.  No, sir.").  While Plaintiff Gerena does not offer any evidence in his affidavit
concerning his religious freedom claim, he did discuss the issue in his deposition
extensively, and alleges that he has a religious freedom claim "to some degree."  See
Deposition of Charles Gerena, dtk. # 160-1 in case no. 15cv489, at 20; see id. at 20-43.
Defendants do not address the religious freedom issue in their briefing, but they do
seek judgment on each of Plaintiffs' claims.  The Court cannot grant judgment when
Defendants have not explained how a lack of evidence to support that claim mandates

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003). Administering facilities like prisons, however, creates a complex environment where limits on such freedom can occur. Id. (citing Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990)). "'A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" Burns v. Martuscello, 890 F.3d 77, 86 (2d Cir. 2018) (quoting Shakur v. Selsky, 391 F.3d 106, 113 (2d Cir. 2004)). An institutionalized person "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006). The burden then shifts to the defendants to meet "the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct[.]" Id. at 275. Still, "'the burden remains with the prisoner to show that these [articulated] concerns were irrational.'" Id. (quoting Sutton v. Rasheed, 2323 F.3d 236, 253 (3d Cir. 2003) (internal quotations omitted)). "Supreme Court precedents teach that a substantial burden on religious exercise exists when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" Westchester Day Sch. v. Vill. of

---

summary judgment on this issue. Because the Court is not clear from the briefing about whether Plaintiffs in the 15cv489 case even continue to press such a claim, the Court will deny the motion with respect to the religious freedom claim in that case. The denial will be without prejudice, however, to Defendants filing an additional motion related only to that issue.

Mamaroneck, 504 F.3d 338, 348 (2d Cir. 2007) (quoting Sherbert v. Verner, 374 U.S. 398, 404 (1963)).

Defendants do not argue that Plaintiffs lack sincerely held religious beliefs. They instead argue that the CNYPC-SOTP facility reasonably accommodates the exercise of those beliefs. They contend that they have not substantially limited Plaintiffs' religious practice and that any limitations are justified by legitimate institutional and security interests. They point out that the SOTP program provides residents opportunities to observe their religious faiths by holding services, celebrating holidays, and keeping religious texts important to their faith. The facility also permits residents who have no faith to decline to participate in any such programming. The facility has regularly scheduled times for believers to gather and practice their religions. Residents who practice a faith which has a spiritual advisor who can lead a congregate service are permitted an hour a week for such services. The SOTP also permits such groups an additional hour per week for religious study, devotions and discussions. While Defendants acknowledge that the Neopagan/Druid/Asatru group formerly had only an hour to meet, they contend that the program hired a full-time faculty Chaplain in August 2019, and this group has the two hours for religious programming that residents of other faiths enjoy. While the Defendants acknowledge that pork, which is part of the diet for feast days in Neopagan religions, is not prepared at the facility, they argue that such food is available for purchase in the commissary. Residents can also order from outside vendors to prepare food for feasts twice per year. Defendants also claim that, with restrictions as to size, residents may possess and wear religious items such as chains and crosses.

24

Plaintiff Schraenkler argues that the facility violates his First Amendment rights in two ways.   First, he points to his affidavit to indicate that he does not have access to the pork he needs for his religious feasts.  The CNYPC-SOTP program does not permit residents to bring pork purchased at the commissary to the treatment mall, where religious feasts are held.  Schraekler has not had pork for a feast for five years.  While Plaintiff acknowledges that the facility has promised that he will be permitted two hours per week for religious programming like residents of other faiths, he contends that the facility has not yet permitted such activity.  He therefore contends that a question of fact exists as to whether the facility has reasonably accommodated his sincerely held religious beliefs.

As part of Defendants' response to Plaintiffs' briefing, they submit a declaration from Jeffrey Nowicki, who is the Chief of Mental Health Treatment Services for the SOTP.  See dkt. # 158-1 in case no. 15cv1327.  Nowicki relates that, like so much of America during the current public health crisis, programs at CNYPC have been altered and limited in an effort to prevent the spread of the virus.  Id. at ¶ 3.  The facility has adopted a number of measures, including: an end to internal transfers of residents except for medical needs "or exigent operational circumstances"; providing guidance from the Department of Health to residents about preventing spread fo the virus, displaying posters with health information, and distributing handouts; handing out masks and face covering to residents and directing residents to wear those devices when not in their rooms; engaging in "enhanced cleaning/sanitizing measures"; isolating and quarantining residents positive with the virus or residents suspected of having the virus until confirmed negative; suspending visitation temporarily; and limiting gatherings

25

of residents "to maintain social distancing." Id. Public health guidelines for social distancing place "limits [on] the number of individuals who can congregate in particular treatment areas" and makes "large gatherings" impossible. Id. at ¶¶ 4-5. Moreover, residents from different wards are not permitted to "comingle." Id. at ¶ 5.

These measures have "prevented some religious gatherings for all residents," and not just for the Neopagan/Druid/Asatru group of which Plaintiff Schraekler is a member. Id. Only recently have outside religious leaders been able to return to the buildings to conduct in-person religious services. Id. The facility still does not permit residents from different wards to gather in the Treatment Mall. Id. The facility has not held religious feasts during the pandemic. Id. at ¶ 6. Nowicki also avers that "New York state has issued mandatory guidelines for religious services which impact the number of attendees as well as prohibiting the provision of food." Id. Once New York permits such activities, "the Neopagan/Druid/Asatru group as well as other faiths will have two hours of congregate worship per week as well as the ability to engage in feasts." Id. The facility is holding "discussions" on how "to allow religious feasts for residents by sending meals to the unit for personal consumption in their living unit." Id. The facility anticipates permitting "residents to consume" the feast "meal in a socially distant manner in the dayroom or dining hall with their fellow adherants." Id. The facility also expects to permit resident "to transport their personally purchased pork items to the designated religious feast for their own personal consumption." Id. at ¶ 7.

No Plaintiff continues to argue that Defendants' restrictions on the size of religious items violate their First Amendment rights or lack some legitimate penological objective. The Court finds that no evidence exists to find that the limits that Defendants

26

enforce violate Plaintiffs' rights.  Plaintiffs do not argue that their religious beliefs require items of a particular size, and Defendants' regulations do not prohibit the items altogether, but instead limit their size in the interest of safety in the facility.  To the extent that such a claim remains, the Court finds that Plaintiffs have pointed to no evidence that raises a factual question about whether those size limits place a substantial limit on First Amendment rights, and the Court will grant the motion in that respect.

Two claims remain, then: whether the Defendants' regulations on the consumption of pork represent a substantial limitation on religious rights and whether the limits on hours of practice for neo-pagan groups represents such a limitation.  The evidence recited above indicates that Defendants intend to change their policies to meet Schraenkler's concern about the amount of religious programming available to him and the food that he can use for religious feasts.  Perhaps if Defendants had implemented those changes, the Court could conclude that Defendants' policies do not violate Plaintiff's First Amendment rights because they do not place a substantial burden on Plaintiff's religious practices.  Defendants admit, however, that because of the current health crisis the policies in question are not in place, and merely theoretical. Under those circumstances, the Court cannot find that no question of fact exists as to what the policies are, or what sort of burden they will place on Schraenkler's practice when implemented.  The Court must therefore find that a question of fact remains as to whether Defendants have placed a substantial burden on Plaintiff Schraenkler's exercise of his Asaratu religious faith in the way that SOTP limits access to pork products and in the amount of religious programming that persons of neo-pagan faith

27

receive.  Defendants' motion will be denied in this respect with respect to this portion of Schraenkler's claims.

###   B.   Access to the Courts

The Plaintiffs in all three cases allege that the Defendants' policies regarding access to the Courts violate their constitutional rights.  They argue that the provisions for a law library are inadequate, that they do not have access to legal representation in ways to which they are entitled, and that their ability to contact their attorneys is too limited.

As a general matter, "[t]he First Amendment provides, in relevant part, that 'Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for redress of grievances.'" City of New York v. Baretta U.S.A. Corp., 524 F.3d 384, 397 (2d Cir. 2008) (quoting U.S. CONST. AMEND. 1).  This petition right includes a right of access to the courts.  Id.  This right applies to prisoners and detainees.  Bourdon v. Loughren, 386 F.3d 88, 92 (2d Cir. 2004) (citing Bounds v. Smith, 518 U.S. 343, 350 (1996)).  Courts in this Circuit have concluded that the standard for access to the courts is the same for civilly committed persons, like Plaintiffs, as for prisoners.  See, e.g., Lane v. Carpinello, No. 07cv751, 2009 U.S. Dist. LEXIS 88345 at *85 n.26 (N.D.N.Y. Aug. 31, 2009) ("Although plaintiff was not a prisoner but involuntarily committed at CNYPC at all times relevant to this claim, the right of access to court evolves from the First Amendment and thus the analysis is the same in either context."); Samuels v. Stone, No. 98 Civ. 776, 1999 U.S. Dist. LEXIS 12582 at *9 (S.D.N.Y. Aug.. 17, 1999) (civilly committed "plaintiff unquestionably enjoyed a right of access to the courts during the period of his confinement"); Lombardo

28

v. Holanchock, No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753 at *16 n.6 (S.D.N.Y.

June 25, 2008) (treating a First Amendment free exercise claim by civilly committed

person the same as one by a prisoner); Aiello v. Lamitie, No. 16cv53, 2020 U.S. Dist.

LEXIS 32590 at *26 (N.D.N.Y. Feb. 26, 2020) ("The analysis for a denial [of] access to

the courts claim is the same for both civilly committed individuals and prisoners.").

        Defendants argue that no evidence exists to support a claim that Plaintiffs have

been deprived of access to the Courts because the facility lacked a law library.  While

the facility lacked any sort of a law library at the time Plaintiffs filed their initial lawsuits

in 2013 and 2015, both SOTP buildings now have five LexisNexis terminals with access

to relevant case law and adequate hours to research cases and claims.

        Nowicki's Affidavit also claims that, even in the face of the pandemic, residents

retain access to the law library.  When the health crisis first began, Plaintiffs did not

have extensive access to the computer terminals housing the legal materials, as they

were on the Treatment Mall, where "access . . . was restricted."  Nowicki Affidavit at ¶ 8.

At the beginning of the pandemic, Nowicki reports, residents too were concerned about

protecting their health and courts were closed.  Id. at ¶ 9.  Residents "were not

requesting access to Lexis." Id. at ¶ 9.  By June 2009, however, residents began

against making "a few requests" to use the library.  Id.  Recognizing these demands,

the facility developed a policy that would permit use of the computers even as the

Treatment Mall remained closed.  Id. at ¶ 10.  The SOTP program issued a

memorandum on July 2, 2020 explaining that policy.  See Exh. A to Nowicki Affidavit,

dkt. # 158-2 in 15cv1327..  That policy, designed "[t]o ensure residents have access to

the Law Library during the COVID-19 pandemic," put the computer terminals on

"portable carts which will be rotated between units." Id.  "The carts will be rotated between units daily Monday-Friday from 9:00 A.M. to 4:00 P.M."  Id.  A clarification on the next page of the memorandum makes clear that terminals would be available in each unit every day from Monday through Friday.  Id.  Staff were to help with setting up the machines  and inspect them at the end of the day.  Id.  Sign-up sheets were in place for 30-minute intervals, but users could remain at the terminal as long as no other resident had requested to use it.  Id.  Residents were to sanitize the carts at the end of each use.  Id.  "Tampering" with the carts was proscribed, and a resident who damaged a cart could be prevented from further use.  Id.

The right of access to the courts "'requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.'" Lewis v. Casey, 518 U.S. 343, 346 (1996) (quoting Bounds, 430 U.S at 828).  "Although prisons must provide inmates the means to ensure a reasonably adequate opportunity to access the courts, a prisoner claiming denial of such access must demonstrate that the prison hindered his efforts to purse a non–frivolous legal or administrative action." Guarneri v. West, 495 Fed. Appx. 142, 145 (2d Cir. 2012) (internal citations omitted). "Because law libraries and legal assistance programs do not represent constitutional rights in and of themselves, but only the means to ensure a 'reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts,' prisoners must demonstrate 'actual injury' in order to have standing."  Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001).  A prisoner "must show 'that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a

30

legal claim' – for example, by demonstrating that he has been unable to file a complaint or has had a complaint dismissed for failure to observe a technicality."  Id. at 184 (quoting Lewis, 518 U.S. at 351).

Plaintiffs argue that they have produced evidence of actual injury by pointing out that, until recent changes, Defendants did not provide any sort of law library.  As far as that goes, the Court agrees that the failure to have a law library altogether is evidence that a jury could use to find actual injury for any Plaintiff who could produce evidence that he had been unable to file a complaint or had an action dismissed because he did not understand technical legal rules.  Such a claim is general, however, and could apply to any person in the SOTP program.  Here, however, Plaintiffs must point to evidence from a person in the program that demonstrates that the Defendant's policies hindered that person's ability to make a legal claim. See, e.g., Amaker v. Fischer, 453 Fed. Appx. 59, 63 (2d Cir. 2011) ("To establish standing for a claim for the denial of access to the courts, an inmate must show that he has suffered an 'actual injury' traceable to the challenged conduct of prison officials–that is, that a 'nonfrivolous' legal challenge to his judgment of conviction or conditions of confinement 'had been frustrated or was being impeded' due to the actions of prison officials.") (quoting Lewis, 518 U.S. at 351-53, 355).  Plaintiffs certainly produce evidence that a reasonable fact-finder could use to conclude that the legal research facilities available are inadequate: they point out that users receive little training and assistance in accessing the computer-based research system that the facility provides; the facility provides only limited amounts of time to use such facilities; printing costs can be prohibitive; and research assistants lack

knowledge.  <u>See, e.g.</u>, Declaration of Richard Rosado, dkt. # 160-1 in 15cv1327, at ¶¶

38-52; Peana Affidavit, at ¶¶ 16-32; Schraenkler Affidavit at ¶¶ 23-38.[7]

These affidavits, however, provide only generalized statements about the

adequacy of the legal research assistance the facility provides.  Almost none of the

Plaintiffs who complain about the legal research resources the SOTP provides alleges

that this lack of access prevented them from filing a claim.  One Plaintiff, Charles W.

Gerena in case no. 15cv489, describes similar limits on his ability to do computer-based

legal research as the other Plaintiffs.  <u>See</u> Charles Gerena Affidavit, dkt. # 127-5, at ¶¶

35-49.  Gerena reports that "I am often frustrated by the lack of legal materials and help

here at CNYPC."  <u>Id.</u> at ¶ 49.  While Gerena alleges "frustration," he does not allege

that the limitations in access to legal research actually hindered him from filing a claim.[8]

─────────────────

[7]With the exception of the case of Pelligrino, discussed below, the Court's review of deposition testimony does not reveal statements from any Plaintiff explaining how the lack of or conditions of the present law library hindered that Plaintiffs ability to press a legal action.  Plaintiffs do not point the Defendants to any such testimony.  These Plaintiffs have not met their burden to point to specific record evidence that shows the law library has hindered their ability to bring a claim.  The Court is unpersuaded by Plaintiffs general claim that the fact of their confinement creates a continual injury and that this continual injury satisfies the requirement that they show damage.

[8]Defendants' reply to Plaintiffs' opposition to the motion in case no. 15cv489 includes Gerena's answers to interrogatories.  In those interrogatories, Defendants asked Gerena to "identify each and every case, appeal, and/or legal matter which was frustrated or you were unable to pursue as a result of the alleged lack of access to legal materials, lawyers, and courts, as alleged in Part A of the amended complaint.  Please include in your response a complete description of the nature of each legal matter including case names and index numbers."  <u>See</u> exh. A to Affirmation of Christopher J. Hummel, dkt. # 130-1 in 15cv489, at Interrogatory No. 5.  Gerena's response lists four cases filed in New York state and federal courts.  Gerena did not mention these cases in his affidavit, and has offered no evidence in his briefing about them.  Defendants use these filings to argue that "[i]n addition to this proceeding, Plaintiff Gerena commenced two state court proceedings, an additional federal court proceeding, and filed a notice of intent in the New York State Court of Claims."  Defendants note that Gerena filed a

Only one Plaintiff, Richard Pelegrino in Case No. 15cv489, alleges both similar limitations on the legal research facilities and assistance the Defendants provide while alleging that "I wanted to bring lawsuits about assaults by staff, but have not been able to do so because of the lack of access to legal materials."  Pellegrino Affidavit, dkt. # 127-4 at ¶ 32.

While Pellegrino's affidavit is a slim reed, the Court finds that evidence sufficient to avoid summary judgment for him on that claim.[9]  The Court notes that Defendants here refuted Gerena's claims about lack of access to the courts by pointing to his answers to interrogatories, but made no disclosure in relation to Pelligrino.  The Court finds that only Plaintiff Pelegrino has produced evidence that can survive a motion for summary judgment on his access-to-the-courts claim with respect to the legal research facilities available to inmates.  Plaintiff Pelegrino has alleged particular types of claims that he would have brought had the facilities and assistance available to him been adequate to allow him to research the legal issues.  He has thus produced evidence that the facilities in question hindered his ability to bring a claim and Defendants' motion will be denied with respect to this Plaintiff.  As for the other Plaintiffs, they have not produced any evidence of injury, just a general dissatisfaction with conditions.  That

---

case in this court with a resident at CNYPC and litigated that claim to completion *pro se*.  See Gerena v. Hess, Case. No. 9:13cv953 (N.D.N.Y).  Plaintiffs make no effort in their briefing to discuss that case or to point to any evidence of how Gerena's lack of access to legal research materials or assistance hindered him in making this claim. Defendants provide no similar evidence from Pellegrino's responses to interrogatories.

[9]Pelligrino's deposition testimony supports this claim as well.  See Deposition of Richard Pelligrino, dkt. # 106 in case no. 15cv489 at 22-35.

lack of evidence means that summary judgment must be granted with respect to these other Plaintiffs on this part of their access to the courts claim.[10]

## C.    DUE PROCESS

Defendants next seek dismissal of a variety of different claims that Plaintiffs make about the conditions of their confinement, which the parties agree generally fall into the category of due process claims.  The Court will address each in turn.

At issue here are substantive due process rights under the Fourteenth Amendment.  See Youngsberg v. Romeo, 457 U.S. 307, 315-16 (1982).  As a general matter, "[t]o determine the substantive rights of a person involuntarily committed to a state institution, the interests of the individual are balanced against the interests of the state."  Ahlers v. Rabinowitz, 684 F.3d 53, 61 (2d Cir. 2012).  "'[P]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to

---

[10]Plaintiffs also argue that they have demonstrated damage because they have lacked access to the Courts during the period when no law library was available to them.  As explained, they have only offered a general claim about their inability to file cases and have not pointed to specific claims hindered by the former situation. They also do not seek any monetary damages for past violations of their Constitutional rights. As a general matter, Plaintiffs argue that the lack of a law library in the past and the current alleged inadequacies of a law library have hindered their ability to challenge the fact of their confinement.  Plaintiffs are held against their will in the SOTP, and they contend that a lack of adequate law library amounts to a continual hindrance on their ability to seek release.  None of the Defendants, however, have argued that MHLS attorneys failed to provide them with representation during the reviews mandated by the Mental Health Law and have not pointed to particular cases where MHLS attorneys frustrated their ability to bring meritorious civil claims against the program.  To the extent that Plaintiffs oppose summary judgment in relation to the access to the courts they have through their MHLS attorneys, which the State provides, the Court finds that Plaintiffs have not pointed to any evidence to support those claims and the motion will be granted in that respect.

punish.'" Id. (quoting Youngsberg, 457 U.S. at 321-22).  The Plaintiffs thus argue, that,

as a general matter, the conditions of confinement they experienced as prisoners in the

New York Department of Corrections and Community Supervision ("DOCCS") were

better than those in the SOTP.  The Court notes that the question is not necessarily one

of comparison with DOCCS, but whether conditions at SOTP violate Plaintiffs' rights.

Even in civil confinement, "the state's interest in maintaining order and security is not

punitive in purpose or character, and remains valid in institutions of civil commitment."

Id.  Moreover, "[t]he state . . . has an interest in treating the civilly committed individual."

Id.  Two goals exist for involuntary commitment: "'to provide care and treatment to those

unable to care for themselves and to protect the individual and society from those who

pose a danger to themselves and others because of mental illness.'" Id. (quoting Goetz

v. Crossen, 967 F.2d 29, 34 (2d Cir. 1992)).  In evaluating such programs, courts are to

"show deference to the judgment exercised by a qualified professional."  Youngberg,

457 U.S. at 322.

### i.    Employment and Vocational Training

Defendants seek dismissal of any claims Plaintiffs make regarding the adequacy

of the employment and vocational training programs that the SOTP provides.  They

argue that, with regard to such programs, Plaintiffs cannot prevail on a due-process

claim because they do not have a property right to such training programs that is

protected by statute or the Constitution.  In any case, Defendants claim, the training

programs are adequate to meet the needs of residents to prepare for reentry into

society.  Beyond the employment and training the facility provides, the Defendants also

point out that educational programs are available.  Such opportunities include the ability

to obtain a GED and to seek out higher education through correspondence courses.  In any case, Defendants argue, the program's treatment professionals have concluded that therapeutic programming is more important than work and vocational training for residents.  Defendants respond that the educational and vocational training programs the facility provides are inadequate, as they are merely menial and do not provide assistance for resident's transition to life away from the SOTP, as DOCCS programs do.  They do not address or offer any case law to dispute Defendants' claim that the Constitution does not oblige Defendants to provide Plaintiffs with such training.  Indeed, the Plaintiffs in case no. 15cv489 and 13cv359 acknowledge that argument and state: "[t]his may be so, and it may be that the State of New York, through DOCCS, had no federal constitutional obligation to provide incarcerated inmates with vocational education."  Still, the State did so, and Plaintiffs found that program much more beneficial to them than the one the SOTP program provides.

As Plaintiffs acknowledge, the law is clear that prisoners enjoy no protected liberty or property interest in vocational education or work opportunities while incarcerated.  See, e.g., Gill v. Mooney, 824 F.2d 192, 194 (2d Cir. 1987) (no "liberty or property interest" in prison employment under New York law).  Plaintiffs have not pointed the Court to any case or statutory law that indicates that persons in civil confinement have a liberty or property interest in educational programming that implicates the due process clause.  To the extent that Plaintiffs maintain that a claim exists because the education and vocational training programs the SOTP provides are inadequate, the Court defers to the expert opinions of treatment professionals described above, which indicate that educational and vocational programs serve a

treatment purpose as much as a training one.  The SOTP, Defendants relate, is also much smaller in scale than DOCCS facilities, and opportunities for varied employment thus fewer.  Plaintiffs' affidavits and depositions make clear that they find the work opportunities available uninteresting and not challenging.  As the case law related above makes clear, however, the Court is to defer to the opinions of treatment professionals as to priorities for programming, balancing the Plaintiffs' "postcommitment interests cognizable as liberty interests . . .  against legitimate state interests and in light of the constraints under which most state institutions necessarily operate."  <u>Youngberg</u>, 457 U.S. at 324.  Defendants have provided testimony and affidavits from treatment professionals that explain the priorities and realities of the program and the role of work and education in the design of the treatment program.  Plaintiffs offer no expert challenge to these statements, and the Court cannot find that "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person did not base the decision on such judgment."  <u>Id.</u> at 323.  The Court will therefore grant the Defendants' motions with respect to this aspect of their due process claim.

### ii.    Treatment Program and Privileging

Defendants seek summary judgment on Plaintiffs' claims related to the adequacy of the treatment programming the facility provides.  They argue that the evidence indicates that the treatment programs were designed and implemented by professionals to achieve specific treatment goals, and that the Court is obligated to defer to the opinions of those treatment professionals because there is no evidence to support a conclusion that the programs represent a substantial departure from accepted

37

professional judgment.  Plaintiffs generally dispute the efficacy of the programs, arguing that they fail to provide any sort of meaningful treatment and thus violate their constitutional rights.  They contend that the Defendants' position is that they are not entitled by the Constitution to any sort of meaningful treatment for the conditions that led to their confinement.

To the extent that the parties have a legal disagreement about whether Plaintiffs have a due process right to meaningful treatment while in civil confinement, the Court finds that answering that legal question–which Defendants admit has not been resolved by the Second Circuit–is not necessary to answer this question.   The Court again notes that, while a civilly committed person has a right to "reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required to meet those interests," the Court's evaluation of such programs is a limited one. Youngberg, 457 U.S. at 324.  "In determining whether the State has met its obligations in these respects, decisions made by the appropriate professionals are entitled to a presumption of correctness."  Id.   The evidence in this case is sufficient to resolve the question, assuming that Defendants have such a right to treatment.

As explained above, the treatment professionals in this case have implemented a detailed treatment program that employs a certain program, certain privileges, and certain restrictions.  Defendants do not deny that these programs were implemented by treatment professionals, though they do dispute how well they work.  Plaintiffs' evidence does not serve to overcome the presumption of correctness, and they provide no expert

testimony to demonstrate how they are inadequate.[11]  Plaintiffs here offer evidence that indicates that they often disagree with the treatment decisions made in their experience.  Generalized statements that Plaintiffs disagree with the treatment decisions Defendants make in their particular cases does not overcome a presumption that such decisions were correct.  Plaintiffs do not offer evidence that the treatment programs are "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person did not base the decision on such judgment."  Youngberg, 457 U.S. at 323.

The Plaintiffs also assert that the "privileging" system described above violates their constitutional rights.  Plaintiffs in case no. 15cv1327 allege that the privileging system has been used against them in arbitrary and punitive ways, and not as part of any treatment program.[12]  Plaintiffs argue that no evidence supports any claim that the

---

[11]One Plaintiff, Richard Rosado in case no. 13cv359, avers that "[d]ue to the stagnant nature of the treatment program, and the fact that the information I shared in therapy was used by the state to reconfine me on the basis that I was not progressing in treatment, I have not participated in treatment during the summer of 2016."  Rosado Dec. at ¶ 10.  After eight years in the program, finding the content and therapy unchanging, Rosado decided that "[i]nstead of doing the same thing over and over while expecting different results" he would "stop participating in treatment."  Id.

[12]Plaintiffs do not seek any damages for these alleged past violations.  Plaintiff John Peana alleges that "from 2008 to the present, privileges have been unexplainably taken away from me on hundreds of occasions."  Peana affidavit at ¶ 37. He lost privileges when attacked by another inmate; a Treatment Team Leader allegedly attacked him for receiving a credit card application and then denied him privileges; he lost privileges after refusing a transfer to another unit; he has lost privileges without an investigation after being accused of "grandstanding or being argumentative."  Id. at ¶¶ 38-41.  Such actions were "punitive," Peana claims, and not related to treatment.  Id. at ¶ 42.  Arthur Kohler likewise argues that "my privileges are routinely taken away from me for unexplained reasons, including, but not limited to, work, phone, media, exercise, yard paper, and outside purchasing."  Kohler Affidavit at ¶ 44.  Schraenkler offers an identical accusation.  Schraenkler Affidavit at ¶ 45.  The Court notes neither that Kohler

privileging system in place appeared as part of a treatment program designed by professionals.

As Judge Mae A. D'Agostino of the United States District Court for the Northern District of New York has concluded, "courts in this circuit have repeatedly found that" the privileging system at SOTP "does not implicate the Due Process clause." Aiello v. Lamitie, 2020 U.S. Dist. LEXIS 32590 at *16 (N.D.N.Y. Feb. 26, 2020)(citing Groves v. New York, No. 9:09ccv412, 2010 U.S. Dist. LEXIS 29722 2010 WL 1257858, *10 (N.D.N.Y. Mar. 1, 2010); Haden v. Hellinger, No. 9:14cv318, 2016 U.S. Dist. LEXIS 137311, 2016 WL 8673144, *13 (N.D.N.y. Sept. 30, 2016); June, 2014 U.S. Dist. LEXIS 16039; Yeldon v. Hogan, No. 9:08cv769, 2010 U.S. Dist. LEXIS 23821, *14-15 (N.D.N.Y. 2010); McChesney v. Hogan, No. 9:08cv163, 2010 U.S. Dist. LEXIS 92948, 2010 WL 3602660, *12 (N.D.N.Y. Aug. 17, 2010)).  Even assuming these courts were incorrect, the Court finds no due process violation.  Having examined all of the evidence in the cases now before the Court, the Court concludes that no evidence exists by which the Court could find that the privileging system violates the Plaintiffs' constitutional rights, even assuming they exist.  All of the evidence in the case indicates that the system "was implemented for legitimate reasons made by qualified professionals." Yeldon, 2010 U.S. District LEXIS at *14.  Plaintiffs' disputes with particular decisions made in their own cases does not undermine this conclusion, especially since they do not seek damages in their cases.

        **iii.**    **Access to Media**

---

nor Schraenkler offer any evidence of specific incidents where they lost privileges under this system, but make only general claims.

Defendants seek summary judgment on any claims that their policies restricting access to media violate Plaintiffs' constitutional rights.  They argue that those policies were determined by medical professionals who used their judgment to advance the SOTP's treatment interests, as well as the safety of the public.  Defendants have concluded that residents, who have been convicted of sexual crimes, including crimes involving children, should enjoy limited and restricted access to media that contains violence, nudity, and images of children.  Other policies, such as restrictions on access to local newspapers, serves to protect the staff of the institution.  Plaintiffs respond by pointing out that DOCCS has programs that allow wider access to media and to the Internet than Defendants permit, and that Defendants' own documents indicate that the SOTP acknowledges that access to computers and the internet can be useful for residents when planning for their release. Plaintiffs in 13cv359 also submit evidence in the form of expert testimony that the SOTP could install a firewall that would permit access to the Internet without raising concerns about residents accessing prohibited websites.

The evidence recited above is evidence that the restrictions on media access in place in the SOTP are dictated by professionals' assessment of the rehabilitative and safety needs of the Program.  Plaintiffs do not provide any argument or evidence to dispute the judgment of professionals in limiting access to certain publications or types of television shows or films.  They do not deny that the SOTP has procedures in place for residents to determine whether materials are permitted in the facility, and to challenge restrictions which they find improper.  The Court concludes that the restrictions on access to periodicals, books, television programs, and films described

41

above properly balance residents' rights and the needs for safety and treatment that the

SOTP has.  The undisputed evidence with reference to those restrictions indicates that

they meet the twin goals of involuntary commitment:  "'to provide care and treatment to

those unable to care for themselves and to protect the individual and society from those

who pose a danger to themselves and others because of mental illness.'"  Ahlers, 684

F.3d at 61 (quoting Goetz, 967 F.2d at 34)   Plaintiffs have not produced any evidence

to challenge the presumption of correctness attached to these restrictions instituted

according to the judgment of the professionals who designed them.

Plaintiffs offer argument and evidence only with reference to the policies that

limit access to computers and the internet.  They point to the SOTP's own policy

statements, which acknowledge that access to the internet can be useful to residents.

They also point to DOCCS policies that provide limited access to the internet for

inmates, and to an expert report which indicates that it is possible to restrict access to

sites that would be counterproductive to treatment.  The Court finds such evidence

insufficient to overcome the presumption of correctness of such policies.  Nothing in

such evidence indicates that the SOTP failed to base its decisions about access to the

internet on something other than sound policy.  Plaintiffs do not challenge the need to

restrict access to the internet for residents who have a history of sex offenses and child-

pornography offenses.  Instead, they suggest that there are programs available that

could allow such access.  That evidence does not suggest in any way that Defendants'

programs do not balance the needs and resources of the institution against the

residents' need for programming; the evidence simply suggests other ways that

Defendants might achieve that balance.  Plaintiffs have not pointed to an issue of fact

that would prevent summary judgment on this claim.  The Court will grant all of the Defendants' motions in this respect.[13]

### iv.    Security Devices

Defendants seek summary judgment on Plaintiffs' claims regarding the use of security devices during visits outside the institution.  While Plaintiffs acknowledge that courts in this district have concluded that the use of handcuffs and shackles on residents transported outside the facility do not violate their constitutional rights, they contend that the use of the "black box" does.  See, e.g., Balkum v. Sawyer, 2011 U.S. Dist. LEXIS 122467, *26-27 (N.D.N.Y. Oct. 21, 2011) (use of handcuffs and shackles does not violate residents' rights).  Plaintiffs also contend that the use of handcuffs, shackles, and the black box during medical visits to Walsh Regional Medical Unit, which is at the Mohawk Correctional Facility, adjacent to the facility where the SOTP is located, is unnecessary.  Plaintiffs also contend that Defendants' policies are unnecessary and excessively painful and punitive, and that Defendants use more restraint than is necessary in many instances.

Defendants provide the declaration of CNYPC Chief Safety Officer David Jensen in support of their motions.  See Declaration of David Jensen, dkt. # 105-7 in 15cv489. He provides the Court with the facility's policies on resident transport and the use of safety and security devices during such transports.  See Exhs. A and B to Jensen Dec.

---

[13]As far as the telephone policies go, the evidence recited above indicates that those policies do not violate the Plaintiffs rights, as they are part of the facilities program of safety, security, and treatment and are not in place as a means of punishment.  Plaintiffs do not point to record evidence to conclude otherwise, and summary judgment will be granted in that respect as well.

Jensen avers that "[a]ll forensic patients and residents at the SOTP are considered high risk for transport purposes."  Jensen Dec. at ¶ 5.  Using "safety and security devices for transports outside the secure perimeter" of the facility "is designed to ensure public safety."  Id.  The facility uses such devices when transporting SOTP residents and "forensic patients" and trains staff to use those devices "in both a safe and humane manner."  Id. at ¶ 6.  The facility trains officers in using the devices in ways that "ensure security" but do not "[injure] the resident."  Id. at ¶ 7.  Residents wear the devices "for the duration of the transport to and from CNYPC."  Id. at ¶ 8.  Officers "continually [monitor]" such residents "by a quick visual scan of the devices, asking the resident/patient how he/she is doing and an overall wellbeing assessment."  Id.

Jensen relates that, among SOTP residents, each "resident has been committed by court order, in most instances against their will."  Id. at ¶ 9.  Such persons "may endanger transport staff health and safety, may have violent propensities or may present flight risks were they to be escorted outside the secure perimeter without safety and security devices, thus endangering the public."  Id.  Since transport staff frequently escort residents to unfamiliar places like hospitals, medical offices, and courts, the "safety and security devices" in place "[restrict] the resident's movements, thereby keeping staff and the public safe from any actions which a resident may take to either harm others or attempt to escape."  Id.  Jensen also states that such devices "may" serve as a deterrent to those thinking of escape.  Id.  Since he started at the facility in 1998, Jensen can only recall transport officers failing to use such devices on occasions when the person transported presents a condition where "use of one of the devices is

44

contraindicated," such as when that person "has had a limb amputated, has a cast on a limb, or has sustained a serious injury to a limb." Id. at ¶ 11.

Jensen denies that the facility uses the devices in a "punitive" fashion. Id. at ¶ 12. He contends that, since patients and residents at the facility are there by court order, usually against their will, "[t]hey are considered to be dangerous[.]" Id. Persons in the SOTP "have had specific court rulings that they are dangerous sex offenders requiring confinement." Id. Guidelines do not permit the use of such devices as punishment, but only for "transports outside the secure perimeter of the facility to ensure public safety." Id.

Jensen also explains use of the black box: "[t]he black box is an additional safety device that is a box-type assembly which covers the locking mechanism of the handcuffs and thus prevents picking or tampering with any parts of the lock." Id. at ¶ 13. The purpose of the black box is to "[provide] additional safety and security by restricting a resident's movement while taking a resident on outside trips[.]" Id. Residents "may object to discomfort due to limited mobility while so secured," the device "does not cause injury to residents when properly employed." Id.

When the facility takes residents to Walsh, which Jensen explains "is located on the grounds of Mohawk Correctional Facility," the CNYPC operates according to "a written agreement with" DOCCS "to have access to over 20 specialty care clinics . . . for both our forensic patients and SOTP residents." Id. at ¶ 15. "CNYPC is also required to follow DOCCS protocol while at Walsh including providing all security and supervision of our patients and residents while at these clinics. Furthermore, our

45

patients and residents are held in separate waiting areas from DOCCS inmates until they are called for their specialty clinic."  Id.

Jensen concludes that "[b]ased on my professional judgment and experience, application of safety and security devices is both necessary and appropriate to ensure the safe transport of forensic patients and SOTP residents outside the secure perimeter of CNYPC."  Id. at ¶ 21.

Plaintiffs provide various affidavits that address the use of security devices. Plaintiff Richard Rosado relates that the black box "is extremely painful and uncomfortable."  Rosado Dec. at ¶ 59.  The device "restricts mobility and makes even slight movements difficult and painful."  Id.  Residents wear the devices for hours at a time when they leave the facility.  Id.  Rosado cannot eat, drink, or use the restroom when wearing the black box, and wearing the box leaves his wrists "red and very sore." Id. at ¶ 63.  Rosado has never attempted to escape, and he does not know of anyone who has.  Id. at ¶ 60.  Other, similar facilities, he contends, do not use the same black boxes.  Id. at ¶ 61.  Other Plaintiffs report similar experiences.  See Kohler Affidavit at ¶¶ 38-41; Peana Affidavit at ¶¶ 33-35; Schraenkler Affidavit at ¶¶ 39-42 (Schraenkler claims as well that his ankles are "red bruised and very sore" after he wears leg irons, Id. at ¶ 42); Pellegrino Affidavit, at ¶¶ 99-111.

Plaintiffs have a liberty interest in being free from "bodily restraint."  Youngberg, 457 U.S. at 316.  Those interests are not "absolute," however and when "operating an institution" like the CNYPC, "there are occasions in which it is necessary for the State to restrain the movement fo residents–for example, to protect them as well as others from violence."  Id. at 320.  "The state's interest in maintaining order and security is not

46

punitive in purpose or character, and remains valid in institutions of civil commitment."

Ahlers, 684 F.3d at 61.  Here, too, the Court is required to show deference to the

judgment of qualified personnel.  Id. at 322.

 The Court finds that the Defendants' black box policy and other use of restraints

when transporting residents out of the CNYPC do not violate Plaintiffs' constitutional

right to be free of unreasonable restraints.  As explained above by Jensen, the facility's

restraint procedures are designed to protect the public and ensure safe transport for

residents who are confined involuntarily and who have a history of violence towards

others.  The evidence indicates that the facility implemented the procedures "for

legitimate reasons made by qualified professionals" and not out of some arbitrary effort

to punish residents.  Yeldon, 2010 U.S. District LEXIS at *14.  Plaintiffs have not

produced any evidence to dispute the presumption of correctness of those decisions,

made by the qualified safety staff of the institution.  Their complaints about the

discomfort of the restraints and extent of their use are not complaints that undermine

the professional judgment of those who implemented the program, and the Court will

not disrupt those decisions.  The fact that Plaintiffs complain of redness and swelling

from such restraints does not change the Court's analysis.  Plaintiffs do not allege long-

term injuries, and no evidence indicates that Defendants use the black boxes for some

punitive purpose.  See, e.g., Lynch v. City of Mt. Vernon, 567 F. Supp. 2d 459, 468

(S.D.N.Y. 2008) ("tight handcuffing" that "did not cause [a plaintiff] any continuing injury

is fatal to [an] excessive force claim" because "[t]here is a consensus among courts in

this circuit that tight handcuffing does not constitute excessive force unless it causes

some injury beyond temporary discomfort.") (citing Bratton v. N.Y. State Div. of Parole,

No. 05cv950, 2008 U.S. Dist. LEXIS 30250 at *9-10 (N.D.N.Y. April 14, 2008); Hambert v. Town of Greenburgh, 2007 U.S. Dist. LEXIS 3201, 2007 WL 119291, at *3 (S.D.N.Y. Jan. 16, 2007); Drummon v. Castro, 522 F. Supp. 2d 667, 679 (S.D.N.Y. 2007); Grant v. City of New York, 500 F. Supp. 2d 211, 217 (S.D.N.Y. 2007); Golio v. City of White Plains, 459 F. Supp. 2d 259, 265 (S.D.N.Y. 2006); Vogeler v. Colbath, 2005 U.S. Dist. LEXIS 44658, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005); Wilder v. Vill. of Amityville, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003)).  The Court will therefore grant the Defendants' motions on these claims as well.

### vii.    Visitor Policy

Defendants next seek summary judgment on any claims the various Plaintiffs make regarding the visitor policy.  Defendants contend that Plaintiffs, assuming they have a right to visitors, are subject to reasonable restrictions on such visits.  The policies described above, Defendants claim, represent only reasonable restrictions. Plaintiffs respond that residents in the SOTP program have more restrictions on visitation than those in DOCCS.  They argue that policies restricting visits serve only a punitive purpose and violate their rights.

The Second Circuit Court of Appeals has concluded that "[a]ssuming that prisoners have a right under the First Amendment to have family visits, that right could not require that visits by family members be permitted on demand, but rather must be subject to reasonable restrictions on the time, place and manner of visits." Mills v. Fischer, 497 Fed. Appx. 114, 116 (2d Cir. 2012).  At the same time, "the intentional or malicious deprivation of visitation to a prisoner, even on one occasion, could rise to the level of a constitutional violation."  Id.

Jeffrey Nowicki describes the facility's visitor policy in a declaration.  See dkt. #
105-3 in Case No. 15cv489.  Nowicki relates that "[v]isiting at facilities is strongly
encouraged for both family and friends as it helps maintain ties to the community."  Id.
at ¶ 48.  At the same time, he declares, such "[v]isitation should not . . . interfere with
the regularly schedules programs in which residents are engaged."  Id.  Because the
SOTP's population consists of sex offenders, "visitation must be pre-approved and pre-
arranged and both residents and their visitors are aware of these requirements."  Id. at
¶ 49.  The rules limit the number of visitors and the days of those visits.  Id. at ¶¶ 49-50.
They limit the food that visitors can bring to share because of "safety and security
concerns[.]" Id. at ¶ 51.  Facility administrators express concern about the introduction
of "contraband" such as drugs, and fears that visitors may provide food that undermines
the dietary restrictions some residents have.  Id.  SOTP staff are in the visitor areas
during visits.  Id. at ¶ 53.  While they do not monitor from "close physical proximity,"
they "must maintain constant visual surveillance of the area."  Id.  Residents are
permitted to be near visitors and have "limited physical contact."  Id. at ¶ 54.  Because
of this, "residents are subject to a body search at the conclusion of the visit before
returning to" their units.  Id.  The purpose of such searches is to limit or prevent
"residents from introducing contraband into the facility, in order to ensure the security of
the facility and safety of the residents and staff."  Id.

Plaintiffs do not offer any evidence of malice in the restrictions that Defendants
have put in place on visitation.  They do complain about the limitations on visiting the
facility imposes.  Charles Gerena complains that the "facility is not treating" residents
"as individuals" or "showing us any respect for progress."  Gerena Affidavit at ¶¶ 74-75.

49

Evidence of this lack of individual attention, he alleges, is the fact that "[w]e are all subjected to the same visitor rules." Id. at ¶ 73. Richard Rosado complains that other psychiatric facilities permit visitors to bring in outside food and "visitors to Manhattan Psych and St. Lawrence facilities are not strip-searched after visits." Rosado Dec. at ¶ 58.

The Court finds that the evidence here can only support a claim that Defendants have placed reasonable restrictions on the time manner and place of visits. While Plaintiffs contend that DOCCS facilities and other psychiatric facilities have more lenient policies, Defendants explain why additional limitations exists at the CNYPC. The requirement that visitors must contact the facility seven days in advance of a visit is clearly related to concerns related to the Plaintiffs' treatment as sex offenders and the reason for their continued confinement (a need for treatment). Concerns about contraband entering the facility explains the limits on food that visitors can provide. The limits on the number of visitors, Defendants explain, relates to the amount of space available in the facility. All of these rules are related to the nature of the facility, the resources of the facility, and the needs of the SOTP program. Plaintiffs point to the standard in Youngberg to argue that the visitation program is punitive. Applying that standard, however, indicates that the visitor program supports the goals of the SOTP as articulated by experts. Plaintiffs have not provided any evidence to challenge the presumption of correctness for such programs that Youngberg provides. The Court will grant the motions in this respect as well.

### ix.    Exercise and Outdoor Time

Defendants next seek judgment on any claims that Plaintiffs lack exercise and fresh air.  They point to the evidence cited above that describes the access that Plaintiffs have to a full-size yard where various activities are available, and indoor exercise facilities.  Only the Defendants in case no. 15cv489 raise this issue, and the Plaintiffs fail to respond.  Having examined the evidence on this issue, the Court concludes that summary judgment is appropriate for the Defendants on this claim.  The evidence clearly shows daily access to physical activity, both indoors and out, at the facility.

      **D.**    **Dismissal of Certain Defendants**

Defendants also seek dismissal of claims against certain individual Defendants. The Court will address each in turn.

        **i. Ann Marie T. Sullivan**

Defendant Ann Marie T. Sullivan is Commissioner of the New York State Office of Mental Health ("OMH").  See Declaration of Ann Marie T. Sullivan, dkt. # 137-5 in 15cv1327.  One of OMH's responsibilities is to develop "comprehensive plans, programs and services in the areas of research, prevention, care, treatment, rehabilitation, education and training of persons with mental illness, and to provide facilities or encourage local governments to provide facilities for persons with mental illness."  Id. at ¶ 3.  OMH also has responsibility for both providing mental health treatment and protecting the civil rights of those in their care.  Id.  As Commissioner, Sullivan has "broad responsibility for the functioning of OMH as a whole, the administration of the forensic psychiatric program, and setting standards that

government the numerous entities under the jurisdiction of OMH." Id. at ¶ 4.  While

Sullivan oversees programs and facilities like the SOTP and CNYPC, she is "not

involved in the day to day operation of the CNYPC-SOTP, or in the evaluation,

formulation or implementation of the operating policies and procedures for the" facility.

Id. at ¶ 9.  She also is not involved in "the formulation or implementation of policies

issued by the Bureau of Institutional Sex Offender Treatment ("BISOT")."  Id.  Sullivan

also relates that each individual hospital or facility has responsibility "for formulating

protocols to address resident complaints."  Id. at ¶ 10.  The BISOT is charged with

reviewing, investigating, and acting on resident complaints.  Id.  Sullivan does not

"personally review complaints from SOTP residents."  Id.

Defendants argue that no evidence supports a claim against Defendant Sullivan

under 42 U.S.C. § 1983 because the evidence does not support any finding that she

had any direct role in the policies about which Plaintiffs complain.  Most of the Plaintiffs

do not respond to this argument.  The Plaintiffs in case no. 13cv359, however, argue

that they have sued Sullivan in her official capacity, not her individual capacity.  She is

liable in her official capacity, Plaintiffs in that case claim.[14]  The other Plaintiffs do not

address the issue.

Courts have concluded that "liability for supervisory government officials cannot

be premised on a theory of *respondeat superior* because § 1983 requires individual,

personalized liability on the part of each government defendant."  Raspardo v. Carlone,

---

[14]Nothing in the caption or the allegations in Plaintiffs' Amended Complaint in
that case indicate that Plaintiffs sue Sullivan in her official capacity.  See Amended
Complaint, dkt. # 62, in 13cv359.

770 F.3d 97, 116 (2d Cir. 2014).  A plaintiff must introduce "[e]vidence of a supervisory official's 'personal involvement' in the challenged conduct."  Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001)).  Personal involvement can include "direct participation by the supervisor in the challenged conduct."  Id.  Personal involvement by a supervisor can "also be established by evidence of an official's (1) failure to take correct action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." Id.

Plaintiffs point to no evidence indicating Commissioner Sullivan's personal involvement in any of the constitutional violations here alleged.  The Court will grant the Defendants' motion in this respect.  As far as Plaintiffs' claim that Sullivan has been sued in her official capacity, such language could make her liable as representative of the OMH.  "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state[.]"  Ying Jing Gan v. City of New York, 996 F.2d 522 (2d Cir. 1993).  "State officials can be sued in their official capacities for injunctive relief, but not for money damages."  Kelly v. Tan, No. 11cv614, 2013 U.S. Dist. LEXIS 129166 at*11 (W.D.N.Y. Sept. 9, 2013) (citing Fulton v. Goord, 591 F.3d 37, 45 (2d Cir. 2009)).

The Court will therefore grant the Defendants' motion with respect to Commissioner Sullivan to the extent she is sued in her individual capacity.  The Court

53

will deny the motion with respect to Commissioner Sullivan to the extent that she is sued in her official capacity for injunctive relief.  Since all of Plaintiffs' claims in case no. 13cv359 have been dismissed, no claims against Defendant Sullivan in her official capacity remain.

### ii.    Defendants Maxymillian and Russell

Defendants argue that any claims against Defendants Dr. Terri Maxymillian and Peter Russell should be dismissed because they no longer work for the CNYPC and SOTP and therefore the claims against them are moot.  Plaintiffs do not oppose this portion of the motions.  The Court will therefore grant the motions as appropriate in each case.[15]

## IV.   CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment, dkt. #136 in case no. 13cv359, dkt. # 105 in case no. 15cv489, and dkt. #137 in case no. 15cv1327, are GRANTED in PART and DENIED in PART, as follows:

1.    The motion of Defendants in case no. 15cv1327 is DENIED with respect to the religious freedom claim of Plaintiff Schraenkler;

2.    The motion of Defendants in case no. 15cv489 is DENIED with respect to the access to the courts claim of Plaintiff Pelligrino;

3.    The motion of Defendants in case no. 15cv489 is DENIED with leave to renew with respect to Plaintiffs' religious freedom claims;

---

[15]Russell is not a defendant in 15cv489.

4.     The motion is GRANTED with respect to all claims against Defendant
       Sullivan brought in her individual capacity and DENIED with respect to
       any claims brought against her in her official capacity, to the extent that
       those claims brought in their official capacity survive summary judgment;

5.     The motions are GRANTED in all other respects; and

6.     The Clerk of Court is directed to dismiss the cases against Defendant
       Maxymillian in case nos. 13cv359, 15cv489, and 15cv1327 and Defedant
       Russell in case nos. 13cv359 and 15cv1327.

As no viable claims remain in case 13cv359, the Clerk of Court is directed to CLOSE
that case.

**IT IS SO ORDERED.**

Thomas J. McAvoy

Senior, U.S. District Judge

Dated: October 30, 2020

55